## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**VIRGIL SMITH**                                          **CIVIL ACTION**

**VERSUS**                                               **NO.    19-0839**

**DARREL VANNOY, WARDEN**                                **SECTION: "I"(5)**

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

*Procedural History*

Petitioner, Virgil Smith, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    On June 1, 2001, Smith was charged by bill of indictment with first-degree murder in violation of La. Rev. Stat. § 14:30.[1]    On July 21, 2008, the morning of trial, Smith advised that he wanted to represent himself with his appointed counsel acting as shadow counsel.[2]    After conducting a hearing, the trial court allowed

---

[1]  State Rec., Vol. 1 of 16, Bill of Indictment, 6/1/01 (amended as to date of offense 1/7/08).

[2]  State Rec., Vol. 1 of 16, Minute Entry, 7/21/08; State Rec., Vol. 6 of 16, Trial Transcript, 7/21/08.

Smith to represent himself.[3]    After a five-day trial, on July 25, 2008, a jury found Smith

guilty as charged.[4]    Smith's pro se and counseled post-conviction motions for a new trial

and judgement of acquittal were denied.[5]    On October 8, 2008, Smith was sentenced to life

imprisonment at hard labor without the benefit of parole, probation or suspension of

sentence.[6]

On direct appeal, Smith's appointed counsel asserted that the evidence was

insufficient to support the first-degree murder conviction and that the trial court erred in

permitting two friends of the deceased to testify to hearsay statements allegedly made by

the victim pursuant to La. Code Evid. art. 803(3).[7]    By order dated May 27, 2009, the

Louisiana First Circuit provided that Smith could file a supplemental appellate brief by June

26, 2009, and ordered the record to be forwarded to the Louisiana State Penitentiary so that

Smith could access it.[8]    The record does not indicate that the Louisiana First Circuit ever

received a supplemental brief from Smith.[9]    On September 11, 2009, the Louisiana First

---

[3]    State Rec., Vol. 1 of 16, Minute Entry, 7/21/08; State Rec., Vol. 6 of 16, Trial Transcript, 7/21/08.

[4]    State Rec., Vol. 1 of 16, Minute Entry, 7/21/08; Minute Entry, 7/22/08; Minute Entry, 7/23/08; Minute Entry, 7/24/08; Minute Entry, 7/25/08; State Rec., Vol. 6 of 16, Trial Transcript, 7/21/08; State Rec., Vol. 7 of 16,Trial Transcript (con't), 7/21/08; Trial Transcript, 7/22/08; State Rec., Vol. 8 of 16, Trial Transcript (con't), 7/22/08; Trial Transcript, 7/23/08; State Rec., Vol. 9 of 16, Trial Transcript (con't), 7/23/08; Trial; Transcript, 7/24/08; State Rec., Vol. 10 of 16, Trial Transcript (con't), 7/24/08; Trial Transcript, 7/25/08; State Rec., Vol. 5 of 16, Verdict, 7/25/08.

[5]    State Rec., Vol. 5 of 16, Motion for Post Verdict Judgment of Acquittal, 10/8/08; Motion for a New Trial, 10/8/08; Motion for Arrest of Judgment, 10/8/08; Motion and Memorandum for New Trial, 10/8/08; Motion and Memorandum for Post-Verdict Judgment of Acquittal, 10/8/08; Vol. 1 of 16, Minute Entry, 10/8/08; State Rec., Vol. 10 of 16, Sentencing Transcript, 10/8/08.

[6]    State Rec., Vol. 1 of 16, Minute Entry, 10/8/08; State Rec., Vol. 10 of 16, Sentencing Transcript, 10/8/08.

[7]    State Rec., Vol. 10 of 16, Appeal Brief, 2009/KA/0192, 4/20/09.

[8]    State Rec., Vol. 12 of 16, 1st Cir. Order, 2009 KA 0192, 5/27/09.

[9]    On June 30, 2009, the Clerk's Office for the Louisiana First Circuit returned some unidentified

Circuit Court of Appeal affirmed his conviction and sentence.[10]    The state-court record includes a motion for rehearing, but according to Smith it was returned unfiled.[11]

Smith filed a motion for extension of time with the Louisiana Supreme Court on October 28, 2009.[12]    He filed a writ application with the Louisiana Supreme Court on January 27, 2010.[13]    On February 11, 2011, the Louisiana Supreme Court denied his application for a writ of certiorari, explaining that he did not seek an extension of time until after the time within which to file a writ expired, citing La. S. Ct. R. X § 5.[14]

Smith filed a motion for extension of time by which to file an application for post-conviction relief on November 5, 2012.[15]    Smith claimed that he had received his former counsel's file on November 17, 2011, and had newly discovered evidence that would have changed the verdict.    He requested 90 days to file an application for post-conviction relief. He explained that he had four other appeals related to different convictions and had not had time to file an application of post-conviction relief related to his first-degree murder conviction.    On January 16, 2013, the trial court denied that motion stating "[i]f filed out of

"documents" and exhibits unfiled and advised that he must file a motion for leave to file a late pro se brief and a motion for leave to supplement the record on appeal.    State Rec., Vol. 12 of 16, 1st Cir. Letter, 6/30/09.

[10]  *State v. Smith*, No. 2009 KA 0192 (La. App. 1 Cir. 9/11/09), 17 So.3d 521 (Table), 2009 WL 3161957; State Rec., Vol. 12 of 16.

[11]  State Rec., Vol. 12 of 16, Motion for Rehearing, 2009-KA-0192, undated (received in state district court, 1/10); 1st Cir. Letter, 11/10/09; State Rec., Vol. 11 of 16, La. S. Ct. Motion for Extension of Time, p.1, undated (received 1/26/10).

[12]  State Rec, Vol. 11 of 16, La. S. Ct. Motion for Extension of Time, undated (received 1/26/10).    The motion was accompanied by an "Inmate Funds Withdrawal Request" form dated October 28, 2009.    State Rec., Vol. 11 of 16.

[13]  State Rec., Vol. 12 of 16, La. S. Ct. Writ Application, undated (received 1/27/10).

[14]  *State ex rel. Smith v. State,* 2010-KH-0220 (La. 2/4/11), 56 So.3d 983; State Rec. Vol. 11 of 16.

[15]  State Rec., Vol. 12 of 16, Motion for Extension of Time, 11/5/12.

time the court will consider if appropriate to consider."[16]

On January 12, 2015, Smith filed an application for post-conviction relief with the trial court.[17]    In that application, he asserted (1) the trial court erred when it denied his motion to quash; (2) the State presented false testimony and evidence at trial; (3) the trial court, prosecution and defense counsel violated his constitutional rights thereby subjecting Smith to an unfair trial resulting in a wrongful conviction and sentence; (4) the prosecution used "date and word play" to assist a witness in providing false testimony; (5) the State's claim that Smith raped the victim inflamed the jury and violated due process; (6) a detective falsely testified that he took evidence to the laboratory in Baton Rouge for testing; (7) the trial court erred in allowing the prosecution to amend the indictment; (8) he was constructively denied counsel and compelled to represent himself at trial.

On July 18, 2017, Smith filed a petition for writ of mandamus with the Louisiana First Circuit.[18]    On September 5, 2017, the Louisiana First Circuit granted relief and instructed the state district court to "proceed toward disposition of relator's application for postconviction relief."[19]

---

[16]    State Rec., Vol. 12 of 12, Order, 1/16/13.

[17]    State Rec., Vol. 12 of 16, Uniform Application for Post-Conviction Relief and Memorandum in Support of Petition.    Federal *habeas* courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." *Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006).    The post-conviction application made a part of the state record is undated, however the accompanying memorandum includes a certificate of service dated January 12, 2015.

[18]    State Rec. Vol. 14 of 16, 1st Cir. Petition for Mandamus, 2017 KW 1020, 7/19/17.

[19]    *State v. Smith*, 2017 KW 1020, 2017 WL 3888866 (La. App. 1 Cir. 9/5/17); State Rec. Vol. 14 of 16.

In the interim, Smith sent a letter inquiring into the status of his application for post-conviction relief.[20]     On August 18, 2017, the Clerk of Court for the 22nd District Court of the Parish of St. Tammany sent Smith a letter advising: "please be advised that your relief was filed in our office on February 8, 2015 and was scanned in our office, but was not presented to Judge Coady.     Mr. Smith, your Post Conviction Relief has now been sent to Judge Martin E. Coady for ruling and once ruling is made you will be notified.     Our office apologizes for the delay in this matter."[21]

On August 28, 2017, the trial court denied the application for post-conviction relief finding all the claims to be without merit and explaining "[t]he petitioner filed the pending Application for Post-Conviction Relief in 2015, however, for unknown reasons the application remained in the Clerk of Court's office and was not presented to the Court until now."[22]     On October 14, 2017, Smith filed a writ application with the Louisiana First Circuit Court of Appeal.[23]     On January 25, 2018, the First Circuit denied Smith's writ application finding it to be untimely and successive under La. Code Crim P. arts. 930.4 and 930.8.[24]     On February 8, 2018, Smith sought reconsideration of the ruling.[25]     On March 15, 2018, the Louisiana First Circuit denied relief citing Uniform Rules- Louisiana Courts of Appeal, Rules

---

[20]  State Rec., Vol. 13 of 16, Letter, 2/3/17.

[21]  State Rec., Vol. 13 of 16, Clerk of Court Letter, 8/18/17.

[22]  State Rec., Vol. 13 of 16, State District Court Order denying post-conviction relief, 8/28/17.

[23]  State Rec., Vol. 15 of 16, 1st Cir. Writ Application, 2017-KW-1488, 10/14/17.

[24]  *State v. Smith*, 2017 KW 1488, 2018 WL 566808 (La. App. 1 Cir. 1/25/18); State Rec., Vol. 15 of 16.

[25]  State Rec., Vol. 16 of 16, 1st Cir. Writ for Reconsideration, 2017-KW-1488, 2/8/18.

2-18.7 and 4.9.[26]

On March 28, 2018, Smith filed a motion for extension of time with the Louisiana Supreme Court.[27]    On May 11, 2018, the Louisiana Supreme Court issued its ruling, explaining "WRIT NOT CONSIDERED.    Untimely filed pursuant to La. S. Ct. R. X § 5."[28]    On May 20, 2018, Smith sent a letter to the Louisiana Supreme Court along with an application for writ of certiorari, which was construed as a request for reconsideration.[29]    The Louisiana Supreme Court denied reconsideration on October 15, 2018.[30]

On January 30, 2019, Smith filed the instant application for *habeas corpus* relief.[31]    In that application, Smith claims: (1) the trial court erred in denying his motion to quash; (2) the State presented false information that deprived him of his right to a fair trial; (3) the trial court, prosecution and defense counsel violated his constitutional rights thereby subjecting him to an unfair trial and wrongful sentence; (4) the State misled the witnesses resulting in a violation of due process; (5) the trial court erred in allowing the State to amend the indictment and constructively amend the indictment through the use of jury instructions; (6) newly discovered evidence in the form of a Slidell Police Report proved his actual innocence; (7) the State used "date and word play" to assist a witness in lying; (8) the State claimed the

---

[26]    *State v. Smith*, 17-1488 (La. App 1 Cir. 3/15/18) (unpublished); State Rec., 16 of 16.

[27]    State Rec., Vol. 16 of 16, Motion for Extension of Time, 18 KH 524, postmarked 3/28/18.

[28]    *State v. Smith*, 2018–KH–0524 (La. 5/11/18), 241 So.3d 1011; State Rec., Vol. 16 of 16.

[29]    State Rec., Vol. 16 of 16, Letter to La. S. Ct., 5/20/18; La. S. Ct. Writ Application, 2018 -KH-0524, 5/20/18.

[30]    *State v. Smith*, 2018-KH-0524 (La. 10/15/18), 253 So.3d 1307; State Rec., Vol. 16 of 16.

[31]    Rec. Doc. 3, Petition under 28 U.S.C. § 2254 for Writ of *Habeas Corpus*.    The petition is undated and the envelope with a postmark is not included.    The Court therefore uses to date of receipt as the date filed.

victim was raped to inflame the jury and violated his right to due process; and (9) "claim of lab testing."

The State argues that the application should be dismissed as untimely[32]    Smith has not filed a reply.

### Analysis

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 et seq., governs the filing date for this action because Smith filed his *habeas* petition after the AEDPA's effective date.    *Lindh v. Murphy*, 521 U.S. 320, 117 S. Ct. 2059, 138 L.Ed.2d 481 (1997).    Title 28 U.S.C. § 2244(d) provides:

> (1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> A.  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> B.  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> C.  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> D.  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Typically, a petitioner must bring his Section 2254 claims within one year of the date

---

[32] Rec. Doc. 13.

on which his underlying criminal judgment becomes "final."    With regard to finality, the

United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."    28 U.S.C. § 2244(d)(1)(A).    When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.    *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir. 2003).    However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires."    *Id.* at 694; *see also Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).
>
> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review.    *See Foreman*, 383 F.3d at 338–39.    As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal.    *See Causey v. Cain*, 450 F.3d 601, 606 (5th Cir. 2006); *Roberts*, 319 F.3d at 693.

*Butler v. Cain*, 533 F.3d 314, 317 (5th Cir. 2008).

Smith's state criminal judgment of conviction became final for AEDPA purposes on

October 12, 2009, when his time expired for seeking further direct review by writ with the

Louisiana Supreme Court.[33]    The one-year limitations period would have expired October

12, 2010.    However, Smith did not file the instant federal *habeas* petition with this Court

until January 30, 2019.    Thus, his application must be dismissed as untimely unless the

---

[33]    The 30th day was Sunday, October 11, 2009.    The deadline therefore fell to the next business day, Monday, October 12, 2009.    *See* La. Code Crim. P. art. 13 (weekends and holidays not included in calculation when it would be the last day of the period); Fed. R. Civ. P. 6(a)(2)(C).

deadline was extended through tolling.

    *A.  Statutory Tolling*

    The Court finds no basis for statutory tolling in this case.     Regarding the statute of limitations, the AEDPA expressly provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."     28 U.S.C. § 2244(d)(2).     However, as the state-court record shows, Smith had no such applications pending before the state courts during the applicable one-year period.     The one-year federal limitations period continued to run uninterrupted and expired on October 12, 2010.

    Petitioner's post-conviction application was filed with the state district court on January 12, 2015, more than four years after the one-year federal limitations period had already expired, and therefore could not possibly afford him any tolling benefit.     *See Madden v. Thaler*, 521 F. App'x 316, 320 (5th Cir. 2013); *Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000); *Magee v. Cain*, Civ. Action No. 99–3867, 2000 WL 1023423, at *4 (E.D. La. Jul. 24, 2010) (citing *Williams v. Cain*, Civ. Action No. 00–536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000)), *aff'd*, 253 F.3d 702 (5th Cir. 2001).     Simply put, once the federal limitations period expired, "[t]here was nothing to toll."     *Butler*, 533 F.3d at 318.

    Smith's January 14, 2015 application for post-conviction relief did not toll the federal limitations period for an additional reason.     It was ultimately found to be untimely under La. Code Crim. P. art. 930.8 by the Louisiana First Circuit and the Louisiana Supreme Court did not consider his related writ application as it too was untimely.     As the United States Supreme Court has expressly held, when a state post-conviction filing is rejected by the state

courts as untimely, it cannot be considered "properly filed" within the meaning of § 2244(d)(2) and therefore does not toll the limitations period.    *Pace v. DiGuglielmo*, 544 U.S. 408, 410 (2005).    When a post-conviction filing is untimely under state law, "that is the end of the matter for purposes of § 2244(d)(2)."    *Id.* at 414 (quotation marks and brackets omitted).    Because Smith had no state applications pending at any time during the one-year limitations period, he clearly is not entitled to any tolling credit pursuant to § 2244(d)(2).

Petitioner argues that he is entitled to a delayed commencement under Section 2244(d)(1)(B).    His arguments also appear to implicate Section 2244(d)(1)(D).    For the reasons that follow, Smith has failed to demonstrate that either subsection is the appropriate statutory trigger for the federal limitations period.

Section 2244(d)(1)(B) allows a petitioner to "file a *habeas corpus* petition within one year from 'the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action.' "    To establish a state-created impediment, "the prisoner must show that: (1) he was prevented from filing a petition, (2) by State action, (3) in violation of the Constitution or federal law."    *Egerton v. Cockrell*, 334 F.3d 433, 436 (5th Cir. 2003).    In this case, then, Smith must show that the circumstances alleged actually prevented him from filing in violation of the Constitution or federal law.    *Egerton*, 334 F.3d at 436–37; *see also Krause v. Thaler*, 637 F.3d 558, 561 (5th Cir. 2011) (holding that a petitioner "must also show that the [impediment] actually *prevented* him from timely filing his habeas petition") (emphasis in original).    Whether a state-created impediment prevented a petitioner from filing a *habeas* petition under Section 2244(d)(1)(B) is a fact-intensive inquiry.    *See Pace v. DiGuglielmo*, 544 U.S. 408, 416 n. 6, 125 S. Ct. 1807, 161

L.Ed.2d 669 (2005) (Section 2244(d)(1)(B) requires claim-by-claim consideration); *Egerton*, 334 F.3d at 438 (citing *Whalem/Hunt v. Early*, 233 F.3d 1146, 1148 (9th Cir. 2000) (en banc)).

The Court rejects Smith's suggestion that there was a state-created impediment to his timely filing pursuant to 28 U.S.C. § 2244(d)(1)(B).    Smith implies that he was unable to file for collateral review within the applicable time limits because he did not discover the Slidell Police Department Report until he was provided with his counsel's file.    He also claims the trial court's failure to rule on his post-conviction application for two years also was a state-created impediment.[34]

Initially, the Court notes that the State provided Smith's counsel with a 16-page police report from the Slidell Police Department on January 7, 2008, months prior to Smith's trial.[35] According to the report, the victim in this case, Chanda Ladner, was an "involved subject" in a simple battery on March 12, 2001, during which Nicole Bonura allegedly threatened to kill Chanda Lander, days before Lander was murdered.[36]    At trial, after Smith was permitted to represent himself, shadow counsel agreed that Smith had not reviewed all of the discovery; however, throughout the trial, the trial court gave Smith the opportunity to view the evidence.[37]    Further, despite the contention that Smith had not reviewed the evidence, Smith stated in his opening statement that Nicole Bonura threatened to kill Chanda Landra.[38]

---

[34] Rec. Doc. 3, pp. 14-15; Rec. Doc 3-1, p. 10.

[35] State Rec. Vol. 3 of 16, State's Supplemental Answer to Motion for Discovery and Inspection Hand Delivered, 1/7/08.

[36] State Rec., Vol. 3 of 16, Slidell Police Department Law Incident Table, pp. 1, 3, 8, 11/30/06

[37] State Rec., Vol. 8 of 16, Trial Transcript, pp. 1795-96, 1880, 7/23/08; State Rec., Vol. 9 of 16, Trial Transcript, pp. 2102-2103, 2135, 7/24/08.

[38] State Rec., Vol. 7 of 16, Trial Transcript, pp. 1573-74, 7/22/08.

The Court notes that Smith stated in his November 5, 2012 motion for extension of time by which to file a post-conviction application that he had found newly discovered evidence when he received his counsel's files in 2011, but had been working on four other appellate matters and had not had time to file an application for post-conviction relief.[39]    At other times, he has indicated that he received his counsel's files in 2014.[40]

The record, however, establishes that Smith reviewed a copy of the report, at the latest, while his direct appeal was pending in 2009.    In a motion for rehearing, Smith referred to the Slidell Police Report and admitted he received it when the Louisiana First Circuit sent the records to him for him to review in order for him to file a supplemental brief.[41]    He similarly referred to the Slidell Police Report in his related writ application to the Louisiana Supreme Court and in fact again admitted that he received the report when he received the records from the Louisiana First Circuit.[42]    In his application for post-conviction relief, Smith admitted he received a copy of the report in July 2009, but alleged that the importance of the report was not clear to him at that time.[43]    Smith cannot show that he was impeded when he had this evidence in 2009.    As he had the evidence prior to the conclusion of direct review, he could have filed a timely application for post-conviction relief as well as a timely *habeas* petition.

---

[39]  State Rec., Vol. 12, Motion for Extension of Time pp. 1-2, 11/5/12.

[40]  State Rec. Vol. 16, La. S. Ct. Writ Application, 2018-KH-0524, p. 11, 5/20/18; 1st Cir. Writ for Reconsideration, 2017-KW-1488, p. 2, 2/8/18.

[41]  State Rec., Vol. 12 of 16, Motion for Rehearing, 2009-KA-0192, pp. 7, 11-13, undated (received in state district court 1/10).

[42]  State Rec., Vol. 12 of 16, La. S. Ct. Writ Application, pp. 7-9, undated ( received 1/27/10).

[43]  State Rec., Vol. 12 of 16, Uniform Application for Post-Conviction Relief and Memorandum in Support of Petition, p. 31 n. 5, 1/12/15.

Smith also claims that the trial court's two-year delay in the issuance of an order denying his 2015 application for post-conviction relief was a state-created impediment requiring a later starting date for the one-year limitations period.    Initially, had Smith timely filed the application for post-conviction relief, the time during which it was pending would have been tolled.    28 U.S.C. § 2244(d)(2).    He did not file his state post-conviction application until more than **four years after** the federal one-year limitations period expired. Given that his state application was untimely, the trial court's failure to rule on it for two years did not prevent Smith from timely filing his federal *habeas* petition.    In this case, any impediment was plainly self-imposed.    Therefore, Section 2244(d)(1)(B) is inapplicable.

Smith's allegations also implicate 28 U.S.C. § 2244(d)(1)(D).    Under that subsection, the commencement of the federal limitations period is delayed if a petitioner's claim is based on a factual predicate that could not have been discovered earlier through the exercise of due diligence.    The one-year limitations period begins to accrue "when the factual predicate could have been discovered through the exercise of due diligence," not when it was actually discovered by a petitioner.    28 U.S.C. § 2244(d)(1)(D); *see Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000) ("... the time commences when the factual predicate 'could have been discovered through the exercise of due diligence,' not when it was actually discovered by a given prisoner ... [and] not when the prisoner recognizes their legal significance.").    The United States Fifth Circuit has held "that this means the date a petitioner is on notice of the facts which would support a claim, not the date on which the petitioner has in his possession evidence to support his claim."    *In re Young*, 789 F3d 518, 528 (5th Cir. 2015) (citing *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998)); *see also Hunter v. Cain*, 478 F. App'x 852, 853 (5th Cir. 2012) (citing *Starns v. Andrews*, 524 F.3d 612, 620–21 & n. 5 (5th Cir. 2008)

(holding that the relevant date under § 2244(d)(1)(D) is the date that the *habeas* petitioner or his criminal attorney received the information in question)).

Under Subsection D, petitioner's limitations period would run not from the date on which petitioner in fact obtained the Slidell Police Report, but rather from the date on which it *could have obtained through the exercise of due diligence.*    As explained above, Smith's shadow counsel was provided with the Slidell Police Report months prior to Smith's trial in 2008 and was certainly discoverable before Smith's trial.    In any event, Smith candidly admitted that he had reviewed a copy of the report in 2009 while his direct appeal was still pending.    Thus, the factual basis for his claims was personally known to him in 2009.[44]    It is *not* a new factual predicate that would alter the beginning date of the AEDPA one-year statute of limitations.    Yet, petitioner waited more than four years after his conviction became final before he filed his state application for post-conviction relief and nearly nine years before filing his *habeas* petition.

B.  *Equitable Tolling*

The AEDPA's statute of limitations is also subject to equitable tolling.    *Holland v. Florida*, 130 S. Ct. 2549, 2560 (2010).    However, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."    *Id.* at 2562 (internal quotation marks omitted); *see also Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances").    A petitioner bears the burden of proof to establish

---

[44]  Considering Smith's statements and questions to witnesses during trial, he appeared to have been well aware of the report at the time of his trial.

entitlement to equitable tolling.    *Alexander v. Cockrell*, 294 F.3d 626, 629 (5th Cir. 2002).

In this case, the record shows an inexplicable lack of diligence on Smith's part.    As previously explained, as early as 2010, Smith alleged that he had new evidence that would have likely changed the outcome of the trial.    Yet petitioner offers no reason for his failure to file an application for post-conviction relief in a timely fashion.    It is well-settled that mistake, ignorance of the law, and a prisoner's *pro se* status do not suffice to justify equitable tolling.    *Johnson v. Quarterman*, 483 F.3d 278, 286 (5th Cir. 2007); *Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002); *Fierro v. Cockrell*, 294 F.3d 674, 682 (5th Cir. 2002); *Felder v. Johnson*, 204 F.3d 168, 171 (5th Cir. 2000); *see also Tate v. Parker*, 439 F. App'x 375 (5th Cir. 2011) ("The alleged extraordinary circumstances endured by Tate, such as ignorance of the law, lack of knowledge of filing deadlines, a claim of actual innocence, temporary denial of access to research materials or the law library, and inadequacies in the prison law library, are not sufficient to warrant equitable tolling"); *Mathis v. Thaler*, 616 F.3d 461, 474 (5th Cir. 2010) ([E]quitable tolling "is not intended for those who sleep on their rights").

While Smith mentions that he does not have eyeglasses and has pain and sees lights before his eyes,[45]  "[p]hysical incapacity only tolls the statute of limitations if it actually prevents the sufferer from pursuing his legal rights during the limitations period."    *King v. Stephens*, No. A-15-CA-576-LY, 2015 WL 5794004, at *3 (W.D. Tex. Oct. 2, 2015), *certificate of appealability denied*, *Edward King v. Lorie Davis, Director*, 15-51129 (5th Cir. Feb. 15, 2017).    While Smith does not specify when his vision issues began, the issues did not prevent Smith from submitting claims to the state courts previously.    Further, the Clerk of

---

[45]  Rec. Doc. 3-1, p. 16.

Court record shows that Smith previously filed at least four cases with this Court since his first-degree murder conviction in 2008, with two of those cases being filed before the expiration of the limitations period in this case.[46]    Accordingly, the Court finds that Smith is not entitled to equitable tolling.

*C.  Actual Innocence*

Finally, Smith claims that he is actually innocent of the crime for which he was convicted.    In *McQuiggin v. Perkins*, the United States Supreme Court held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass ... [to excuse] the expiration of the statute of limitations."    *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013).    The Supreme Court has cautioned, however, that "tenable actual-innocence gateway pleas are rare[.]"    *Id.*    To succeed on this claim, a petitioner must present a credible claim of actual innocence based on "new reliable evidence ... that was not presented at trial," and he "must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt" in light of that new evidence of his factual innocence.    *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995).    Because actual innocence provides an exception to the statute of limitations rather than a basis for equitable tolling, a petitioner who can make a showing of actual innocence need not demonstrate reasonable diligence in bringing his claim, though a court may consider the timing of the claim in determining the credibility of the evidence of actual innocence.    *McQuiggin*, 133 S. Ct. at

---

[46]    *Smith v. Cain*, 2:12-cv-02086-"F"(2) (*habeas corpus* petition related to conviction for possession of cocaine in violation of La. Rev. Stat. § 40:967C ); *Smith v. Cain*, 1:12-2226"F"(2) (*habeas corpus* petition related to conviction possession of cocaine in violation of La. Rev. Stat. § 40:967C); *Smith v. Cain*, 2:10-cv-00409"F"(2) (*habeas corpus* petition related to conviction of felon in possession of a firearm in violation of La. Rev. Stat. § 14:95.1); *Smith v. Cain*, 10-0413"F"(4) (*habeas corpus* petition related to conviction for two counts of public intimidation in violation of La. Rev. Stat. § 14:122).

1936.

Here, Smith has not met the rigorous burden of proof imposed under the actual innocence exception based on newly proffered evidence.    As "new" evidence in support of his actual innocence claim, he points to a Slidell Police Department Report which he claims proves that he did not commit the murder.

The record facts as succinctly summarized by the Louisiana First Circuit on direct appeal established the following:

> On Friday, March 16, 2001, Emily Ladner and several other family members drove from Picayune, Mississippi to the Cracker Barrel restaurant in Slidell, Louisiana.    At the restaurant, Emily requested that her family be seated in Chanda Ladner's section.    Chanda, the younger of Emily's two daughters, had started work as a waitress approximately ten days earlier and was scheduled to work that day. Emily was advised that Chanda had not reported to work as scheduled.
>
> Emily and her family immediately traveled to Chanda's residence in the St. Tammany Parish Mobile Home Park.    As they approached the trailer that Emily and her husband Cornell had purchased for Chanda, Emily noticed that Chanda's vehicle was parked outside and only the bathroom and hallway lights were illuminated. Since it was between 7:30 and 7:45 p.m., Emily found it odd that Chanda was not using more lights.    After entering the trailer, Emily found her daughter's lifeless body lying on the living room floor.    Chanda was lying on her back with her head resting against an ottoman.    Initially, Emily thought that Chanda might have fallen asleep in that position. However, when Chanda did not respond to several attempts to wake her, Emily knew something was "terribly wrong."    Emily ran outside and called 911.
>
> Lieutenant Kelly James Carrigan of the St. Tammany Parish Sheriff's Office Crime Laboratory was dispatched to the victim's residence at 8:00 p.m. He arrived at the residence at 8:50 p.m. Shortly thereafter, Dr. Michael DeFatta, Chief Deputy Coroner for the St. Tammany Parish Coroner's Office, arrived.    The victim was pronounced dead at the scene.
>
> As Lt. Carrigan walked through the residence, he observed no evidence of forced entry.    Lt. Carrigan then secured the scene for later processing. Numerous photographs were taken during the processing of the crime scene. Due to the extreme amount of clutter present (i.e., clothing, books, animal hair, and various other objects all over the floor and furniture), the scene was processed in layers.    A bloodstain was

found on the sofa and on some clothing on the floor near the sofa.    Lt. Carrigan also discovered a blood stained "skull cap" beneath some clothing on the sofa.    A black condom was also found on the floor near the victim's head.    Although the scene was thoroughly searched for fingerprints, no identifiable prints were found.    Only partial, smeared prints were collected.    A rape kit was used to collect evidence from the victim's body.

Upon examining the victim's body, Dr. DeFatta noted the presence of a nylon stocking wrapped around her neck.    A ligature marking from the stocking was also noted.    A small amount of lividity was present, but not "set in," on the victim's back.    Dr. DeFatta also noted that the victim's eyes showed signs of sclera hemorrhage. Several areas of petechial hemorrhaging, which Dr. DeFatta defined as the bursting of capillaries (indicative of strangulation), were also noted on the victim's eyelids, forehead, nose and cheek.    The victim sustained a stab wound to the right side of her neck.    Based upon the lack of blood near that stab wound, Dr. DeFatta opined that the wound was inflicted perimortem (just before or during death).    Five large lacerations, caused by blunt force trauma, were found on the victim's scalp.    The absence of a significant amount of blood over the victim's head led Dr. DeFatta to conclude that those wounds were also inflicted at or near death.

Four patterned abraded injuries were noted in the victim's chest area near her breasts.    Dr. DeFatta explained that these injuries appeared to have been the result of some type of object being pressed against the victim's skin and held tightly for a period of time causing the skin and tissue to tear.    These injuries, according to Dr. DeFatta, were consistent with the use of a hard object (i.e ., a knife or screwdriver) to keep the victim incapacitated and under control.[1] The object was moved back and forth, either from the perpetrator moving it or from the victim struggling or squirming under the pressure.

[1] A handleless screwdriver and a knife were recovered from the scene.    Neither item revealed the presence of any DNA evidence.

Additionally, although there were no tears, lacerations, or abrasions in the victim's vaginal or anal areas, examination of the victim's clothing revealed signs of sexual assault.    It was noted that the victim was fully clad in a t-shirt and a pair of sweatpants.    The top of the pants were pulled up above the victim's waist, but under the pants, her underwear was down past her vaginal area.    Additionally, despite the existence of several tissue-breaking wounds in her chest area, there were no holes in the victim's shirt.    According to Lt. Carrigan, that evidence was consistent with the victim having been re-dressed following a sexual assault.    Dr. DeFatta explained that the absence of signs of trauma in the sexual area did not indicate that some type of sexual assault did not occur; the victim would have lacked

bruising from rape if she was afraid of the perpetrator and, as such, was submissive.

At the conclusion of the autopsy, Dr. DeFatta concluded that the victim died from asphyxia due to strangulation.    The manner of death was listed as "homicide."

Emily Ladner and her family were puzzled as to who would have wanted to kill Chanda.    Emily described her daughter as a quiet and non-confrontational individual.[2]    Emily explained that Chanda had a "huge heart," was very trusting, and often went out of her way to help anyone in need.    The police investigation of the murder initially focused on the victim's ex-boyfriend, Jonathan Tzunaos; Nicole Bonura, a neighbor with whom the victim had a conflict; and Dominick Faraci, the victim's current boyfriend.    Each of those individuals was questioned, and each cooperated with the authorities by voluntarily providing DNA samples.

> [2] Emily explained that a speech problem in her youth made her daughter uncomfortable verbally expressing herself.    According to her mother, Chanda was "quite humble, in some ways she probably lacked self esteem."    As a result, Chanda often chose to communicate in writing.    She wrote notes to others and sometimes to herself.

The investigation eventually led to the development of defendant as a suspect.    Shortly after learning of the Chanda's death, Marissa Amann and Jeanne Kendrick, the victim's best friends, recalled a recent conversation with the victim.    The friends contacted Emily Ladner and advised her of what had transpired at that January 20, 2001 gathering.    According to Amann and Kendrick, the three high-school friends met at Amann's home for a late Christmas celebration.    The victim attended the party with her new boyfriend, Dominick Faraci, and appeared to be happy.    At some point during the gathering, however, as the friends conversed outside the residence, Chanda became very upset.    She then confided in her friends that she was afraid, and explained that she had been receiving threats from defendant, whom she had previously allowed to reside in her trailer.    According to Amann, Chanda appeared "genuinely afraid," and also stated that defendant had refused to return her trailer keys as requested. Amann and Kendrick advised the victim not to take the threats lightly. They even suggested that she inform her parents and have her locks changed.

At the trial, Emily Ladner testified that during a telephone conversation in December 2000, Chanda advised her that she had houseguests.    Chanda explained to her mother that defendant and his wife, Laurie, had no place to stay and were running short of money. Chanda had decided to help the couple.    She even invited Emily over to meet them, which Emily did on only one occasion.

In a later telephone conversation in late December 2000 or early January 2001, Chanda complained to her mother about the couple's

presence in her home.    She explained that defendant had a bad attitude and was verbally and physically abusive to Laurie.    Chanda described an incident in which defendant had placed his hands around Laurie's neck as if he was going to choke her.    The abuse bothered Chanda.    She also told her mother that defendant once said "angry" things to her when she asked him for money he agreed to pay toward the electricity bill.

Uncomfortable with the entire situation, Chanda no longer wanted to share her home with the couple.    Emily instructed the victim to be firm and to ask the couple to find somewhere else to live. Eventually, the couple moved out and returned to the motel at which they previously resided. According to Emily, Chanda was relieved when the couple left, but she was still worried about Laurie.

Chanda maintained contact with Laurie.    Later, she contacted Laurie's parents and expressed concern for Laurie's safety.    With the victim's assistance, Laurie's father made arrangements for Laurie to return home.    One day, while defendant was at work, the victim picked Laurie up and drove her to the airport.    Laurie left defendant and returned to her parents' home in Arizona.

Back in Arizona, Laurie worried about Chanda.    She was afraid that defendant would harm her if ever he learned that she was instrumental in Laurie's leaving him.    Defendant had previously stated that if he could not have Laurie, no one would.    He also stated that he would kill anyone who helped her to leave him.    Laurie cautioned the victim to "watch her back," as defendant was violent, vicious, and untrustworthy.

On March 17, 2001, the police obtained a taped statement from Geraldine Martin, defendant's mother, regarding defendant's actions and whereabouts on the day Chanda was murdered.    In her statement, Martin explained that defendant came to her house around 5:00 a.m. on March 16, 2001 and told her that he wanted to watch the television news.    After watching the early morning news, he left.    He returned shortly before noon and was in and out of his mother's house that day.    He left shortly after the 6:00 p.m. news concluded.

Martin explained that something was obviously bothering her son when he was at her house that day. Martin encouraged defendant to openly discuss the situation, but he stated that he could not talk to anyone about it. He told her, "[I]t's bad [,]mom[,] it's bad."    Martin counseled defendant about repentance and sin and advised him to pray about the situation that was bothering him.    Martin told the police she specifically spoke to defendant about the religious ramifications of killing and hurting people because he "talks a lot about that kind of stuff."    In the same statement, Martin also described her son as "a time bomb ready to explode at any minute."

Karen Phillips, an admitted drug addict, also testified regarding defendant's actions on the day of the murder.    Phillips stated that she

saw defendant walking up and down her street on Friday, March 16, 2001. Although he was not personally acquainted with her, defendant asked Phillips if he could use her bathroom. Phillips agreed. According to Phillips, defendant used the bathroom twice, each time occupying it for approximately 15-20 minutes. When he was not in the bathroom, defendant never sat down. He stood by the door and looked out at every car that passed on the street. Because defendant told Phillips he was homeless, she invited him to spend the night at her home. Defendant accepted Phillip's offer, but left later without notice. Phillips never saw defendant again. The following day, the police approached Phillips with a photograph of defendant and asked if she had seen him. Phillips advised the police of the prior day's events. Phillips also identified defendant in open court as the man she allowed into her home that day.

The police investigation later revealed that defendant's DNA profile matched the DNA profile of semen taken from the condom found on the floor near the victim's head. Defendant was subsequently indicted for Chanda's murder.

Laurie, defendant's wife, testified at trial and provided background information on her relationship with defendant and how defendant became acquainted with the victim. Her testimony established the following. In 1995, Laurie, her husband at that time, Mike Magee, and their two sons moved to the Chateau Deville apartments in Slidell, Louisiana. Mike was in the Navy and was stationed in New Orleans. While living in Slidell, Laurie met defendant and they began a relationship. Laurie eventually left her husband and moved to the City Motel with defendant. Laurie described defendant as mentally, physically, emotionally, and sexually abusive. Defendant often told Laurie if he could not have her, no one would. He also told her that if anyone ever assisted her in leaving him, and he found out about it, he would kill that person or persons. The violently abusive relationship prompted Laurie to obtain various restraining orders against defendant and to eventually leave him on one occasion before they were married. Laurie returned to Arizona to live with her parents. Eventually, Laurie allowed defendant to join her in Arizona.

Laurie and the defendant were eventually married on March 2, 1999, but the cycle of abuse continued. Laurie again obtained protective orders against defendant, but voluntarily ignored them to be with him on occasion. In October 2000, Laurie and defendant took her father's vehicle (without permission) and returned to Louisiana. Laurie's father reported the vehicle stolen. Shortly thereafter, Laurie and defendant were stopped in the vehicle and arrested. Once released from jail, Laurie returned to the City Motel where she and defendant had been staying. Later, when defendant was released, he obtained a ride back to the motel with Chanda and her then live-in

boyfriend, Jonathan Tzuanos.    Defendant had met Tzuanos while both were incarcerated.    Tzuanos was also being released that day. Tzuanos requested that Chanda give defendant a ride.    She complied. The two couples became friends.

One day, defendant asked Chanda if he and Laurie could stay with her for a while. Chanda agreed to help the couple by allowing them to move in.    The abusive relationship between defendant and Laurie continued, and Chanda observed it.    Laurie and Chanda grew closer. By this time, Chanda was not only providing the couple with housing, but was also responsible for transporting defendant to and from work.

According to Laurie, it was only a matter of time before defendant's violence shifted toward Chanda.    Laurie explained that one day when Chanda complained about having to take defendant to work, he threatened to "put her in the hospital" if she did not provide him transportation.    In response, Laurie begged Chanda to continue to transport defendant to and from work until he found an alternative ride.    Laurie explained that she was afraid that defendant would follow through on his threat to harm Chanda.

As previously noted, the victim later helped Laurie leave the defendant and return to Arizona.    Laurie and Chanda remained in contact, via telephone and mail, after Laurie returned to Arizona. While again in Arizona, Laurie filed for divorce from defendant.    She continued to worry about Chanda, afraid that defendant would harass the victim once he was served with the divorce petition.    Laurie explained that she was afraid of defendant because he threatened her and her family.    She also described earlier incidents in which defendant choked her to the point of unconsciousness.

Although defendant was considered a suspect in the victim's murder early in the investigation, he was not questioned initially because he had fled the state.    He was later apprehended in Arizona. Prior to defendant's arrest, Laurie had informed him of the victim's murder and advised that he was considered a suspect.    Defendant did not return to Louisiana.

Defendant did not testify or present any alibi evidence at trial.[47]

In rejecting Smith's direct appeal claim that the evidence was insufficient to support

the conviction, the court of appeal reasoned:

In his first assignment of error, defendant argues that the state failed to present sufficient evidence to support his first degree murder conviction.    Specifically, he argues that the state failed to present any

---

[47] *State v. Smith*, 2009 KA 0192, 2009 WL 3161957, at *1-5 (La. App. 1 Cir. 9/11/09) 761 So.2d 820 (Table); State Rec., Vol. 12 of 16.

evidence connecting him with the murder.    He argues that the state's evidence proved only that he is a "bully with a temper," who had an abusive relationship with his ex-wife and "liked to mouth off by making grandiose threats."    Defendant urges that the evidence did not prove he was a murderer.    The state's case, he contends, failed to exclude the reasonable hypothesis that he had consensual sex with Chanda and that she was murdered by someone else after he left her residence. The state in turn asserts that the evidence, when viewed in the light most favorable to the prosecution, amply supports all of the essential elements of the crime and defendant's identity as its perpetrator beyond a reasonable doubt.

The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt.    *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).    *See also* La.C.Cr.P. art. 821(B); *State v. Mussall*, 523 So.2d 1305, 1308-09 (La. 1988).

When analyzing circumstantial evidence, La. R.S. 15:438 provides, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."    This statutory test is not a purely separate one from the *Jackson* constitutional sufficiency standard.    Ultimately, all evidence, both direct and circumstantial, must be sufficient under *Jackson* to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt.    *State v. Shanks*, 97-1885, pp. 3-4 (La. App. 1st Cir.6/29/98), 715 So.2d 157, 159.    When the key issue in a case is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification in order to meet its burden of proof. *State v. Millien*, 02-1006, pp. 2-3 (La. App. 1st Cir. 2/14/03), 845 So.2d 506, 509.

First degree murder is defined, in pertinent part, as "the killing of a human being ... [w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... aggravated rape."    La. R.S. 14:30(A)(1).

Initially, we note that because there were no eyewitnesses to directly connect defendant with the victim's murder, the evidence presented at trial was largely circumstantial.    Nevertheless, following a thorough review of the record and the evidence contained therein, we are convinced that the evidence sufficiently proves defendant's identity as the perpetrator of the murder and excludes every reasonable hypothesis of innocence.    Thus, the evidence is sufficient under the *Jackson* standard to convict defendant of the first degree murder of Chanda Ladner.

The trier of fact is free to accept or reject, in whole or in part, the

testimony of any witness.    *State v. Bates*, 95-1513, p. 12 (La. App. 1st Cir.11/8/96), 683 So.2d 1370, 1377.    Moreover, where there is testimony about factual matters, the resolution of which depends upon the determination of the credibility of witnesses, the matter is one of the weight of the evidence, not its sufficiency.    The trier of fact's determination of the weight to be given evidence is not subject to appellate review.    *State v. Willis*, 591 So.2d 365, 372 (La. App. 1st Cir.1991), *writ denied*, 594 So.2d 1316 (La.1992).

In the instant case, defendant argues that the circumstantial evidence presented by the state failed to eliminate the possibility that he engaged in consensual sex with the victim, but that she was killed by someone else after he left her residence.    When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.    *State v. Moten*, 510 So.2d 55, 61 (La. App. 1st Cir.), writ denied, 514 So.2d 126 (La.1987).    The court does not determine whether another possible hypothesis has been suggested by defendant, which could explain the events in an exculpatory fashion.    Rather, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the alternative hypothesis is sufficiently reasonable that a rational juror could not have found guilt beyond a reasonable doubt.    *See State v. Bridgewater*, 2000-1529, p. 9 (La.1/15/02), 823 So.2d 877, 889, *cert. denied*, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003).

In this case, the hypothesis of innocence urged by defendant, i.e., the victim consented to the sexual encounter and was subsequently killed by someone else, was rebutted by the testimonial and circumstantial evidence.    The jury, faced with testimonial evidence of the victim's fear of defendant and defendant's bizarre and suspicious actions immediately after the murder of following the television news and hiding out at the residence of a stranger, obviously rejected the defendant's hypothesis of innocence.    We likewise find defendant's version of the events, presented through his examination of the witnesses at the trial, to be unsupported by the evidence presented at trial.

Therefore, when viewing the evidence in this case in the light most favorable to the prosecution, we find that any rational trier of fact could have concluded beyond a reasonable doubt, and to the exclusion of any reasonable hypothesis of innocence, that defendant raped and murdered the victim.    While we agree that a condom and semen on the scene do not conclusively prove that defendant killed the victim, the DNA evidence confirming that the defendant left semen at the crime scene, together with the other facts established at defendant's trial, provide sufficient evidence from which a reasonable fact finder could have concluded that the defendant was involved in the brutal rape and

24

murder.    Evidence establishing that the victim actively assisted Laurie in her efforts to leave defendant, coupled with defendant's specific threats to kill anyone who provided such assistance, sufficiently proved that defendant had motive to harm the victim. Defendant's actions of leaving the state and refusing to return, even after he learned that he was the subject of the murder investigation, also are suggestive of his guilt.    *See State v. Williams*, 610 So.2d 991, 998 (La. App. 1st Cir.1992), *writ denied*, 617 So.2d 930 (La. 1993).

After a thorough review of the record and the evidence contained therein, we are convinced that the evidence presented at trial fulfilled the standard of excluding every reasonable hypothesis of innocence and was sufficient under the *Jackson* standard to convict defendant of first degree murder.    Further, in reviewing the evidence, we certainly cannot say that the jury's determination was irrational under the facts and circumstances presented to them.    *See State v. Ordodi*, 06-0207, p. 14 (La. 11/29/06), 946 So.2d 654, 662.    This assignment of error lacks merit.[48]

The police report Smith now relies on indicates that Connie Baradell and Chanda Ladner were involved in an incident with Antoinette and Nicole Bonura on March 12, 2001. Ladner advised that she had discovered Nicole Bonura in Ladner's boyfriend's bed that morning.    Baradell explained that Nicole Bonura was her brother's girlfriend and had been driving his car and spending his money.    Baradell asked Nicole Bonura to return the vehicle.    When she refused, Baradell drove the vehicle to Antoinette Bonura's residence and when Baradell began to remove Nicole Bonura's property from the vehicle, a physical altercation ensued.    During the altercation, Nicole Bonura allegedly threatened to kill Chanda Ladner, at which point Ladner locked herself in the vehicle.

Even if the Slidell Police Report could be considered "new" evidence as it was not introduced at trial, it does not show that Smith was factually innocent of first-degree murder. At best, the report could be considered evidence of motive of other suspects.    Nonetheless,

---

[48]    *State v. Smith*, 2009 KA 0192, 2009 WL 3161957, at *8-9 (La. App. 1 Cir. 9/11/09), 761 So.2d 820 (Table); State Rec., Vol. 12 of 16.

the trial transcript shows that throughout the trial, the defense repeatedly highlighted the possibility of the crime having been committed by another person, including Dominick Farcici, Jonathan Tzunaos, or Nicole Bonura.    According to law enforcement testimony, these persons had been investigated and were cleared.    Even if, as Smith suggests, the new evidence could have created a reasonable doubt in the minds of some jurors, this evidence does not satisfy the exacting standard for proving actual innocence for which a petitioner must demonstrate that it is more likely than not that *no* reasonable juror would have convicted him in light of the new evidence.    *Schlup*, 513 U.S. at 327 (emphasis added).

In sum, the instant petition was filed nearly 9 years after the federal limitations period expired.    Smith has not established any basis for statutory or equitable tolling nor has he established that the actual-innocence exception applies.    Therefore, his federal *habeas* corpus petition should be dismissed with prejudice as untimely.

### **RECOMMENDATION**

**IT IS RECOMMENDED** that Smith's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc).[49]

---

[49]    *Douglass* referenced the previously applicable 10-day period for the filing of objections.    Effective

New Orleans, Louisiana, this ___12th___ day of _____June_____, 2019.

**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to 14 days.